Robb, Judge, dissenting.
[1] In affirming the trial court and the various entities below, the majority reads Indiana Code section 26-3-7-2(5) (2010) so that the definition of "claimant" acts as a bar to all claims for grain delivered more than twelve months immediately preceding a licensee's failure. Id; op. at ¶ 22. The result of this interpretation is that only those producers who delivered grain within the twelve months before a licensee's failure are compensated by the statute. As the majority acknowledges, however, an agency's interpretation of a statute is entitled to no deference and I believe this reading of "claimant" is too narrow and serves to exclude producers the statute intended to compensate. Therefore, on the facts presented here, I would reverse the judgment of the trial court and remand for additional evidence.
[2] The legislature added the emphasized language to the definition of "claimant" effective March 2010:
"Claimant" means a person that is unable to secure satisfaction within the twelve (12) months following delivery of financial obligations due from a licensee under this chapter for grain that has been delivered to the licensee for sale or for storage under a bailment.
Ind. Code § 26-3-7-2(5) ; op. at ¶ 23. To the extent that the majority concludes any producer who delivered grain in the twelve months immediately preceding a licensee's failure constitutes a claimant-I agree.[9]
*599 After all, if a licensee failed six months after delivery, the producer is "unable to secure satisfaction within ... twelve months[.]" Id. However, I do not believe these producers are the only claimants.
[3] Nothing in the definition of "claimant" suggests to me that once a producer meets the definition of claimant by having been "unable to secure satisfaction within the twelve (12) months following delivery[,]" that the producer then ceases to be a claimant after twelve months. Having determined the legislature added the language "within the twelve (12) months following delivery[,]" though, the question becomes: why? what purpose did it serve? I believe the statute was amended for two reasons.
[4] First, the language served as a means of defining when, exactly, a warehouse licensee was deemed to have failed. The Licensing Law defined the "failure" of a warehouse licensee as, among other things, "[t]he inability of a licensee to financially satisfy fully all obligations due to claimants." Ind. Code § 26-3-7-2(13)(A) (2015). The previous version of the claimant statute, that without a time period, left uncertainty regarding how long a producer must wait before enlisting the aid of the IGBWLA to collect on outstanding financial obligations. The amended statute, however, resolved that uncertainty by allowing producers to enlist the aid of the IGBWLA once they had attempted to collect a financial obligation from a licensee for a period of twelve months, at which point the facility could be deemed to have "failed," and the IGBWLA would be charged with liquidating the failed licensee's assets through the process contained in Indiana Code section 26-3-7-16.5 (2010). Should a claimant be defined as only those who were unable to obtain satisfaction within the twelve-month period immediately preceding the licensee's failure, as the majority concludes, the foregoing definition of "failure" becomes circular. Under that view, a warehouse licensee fails when they are unable to satisfy their financial obligations to "claimants" for a period of twelve months and "claimants" are only those whose were unable to secure the satisfaction of the financial obligations due from a licensee for the immediately preceding twelve months.
[5] Secondly, the language served to distinguish a "claimant" from a "depositor." A "depositor" was defined as, among other things, "[a] person that delivers grain to a licensee under this chapter for storage or sale." Ind. Code § 26-3-7-2(9)(A) (2015). The claims process provided, in relevant part:
(c) ... At the hearing on claims, the director may accept as evidence of claims the report of agency representatives who in informal conferences with depositors have concluded that a claim is directly and precisely supported by the licensee's books and records. When there is disagreement between the claims of a depositor and the licensee's books and records, the director or the director's designated representative shall hear oral claims and receive written evidence of claims in order to determine the validity of the claim.
* * *
(e) Following the hearing on claims, the director shall make a determination as to the total proven storage obligation of the claimants and the loss sustained by each depositor who has proven a claim. Depositors found to have proven their claims shall be proven claimants. In arriving at that loss, in accordance with section 19 of this chapter, the director shall apply all grain on hand or its identifiable *600 proceeds to meet the licensee's obligations to grain depositors of grain of that type. Initial determinations of loss shall be made on the amount of grain on hand, or identifiable proceeds, and shall reduce the amount to which a depositor may have a proven claim. With respect to the remaining unfulfilled obligations, the director shall, for the sole purpose of establishing each depositor's claim under this chapter, establish a date upon which the loss is discovered, shall price the grain as of that date, shall treat all outstanding grain storage obligations not covered by grain on hand or identifiable proceeds as being sold as of that date, and shall determine the extent of each depositor's loss as being the actual loss sustained as of that date....
Ind. Code § 26-3-7-16.5 (2010).
[6] The claims process clearly acknowledged a difference between a depositor and a claimant, i.e., "the director shall make a determination as to the total proven storage obligation of the claimants and the loss sustained by each depositor who has proven a claim[,]" but provided a means by which depositors could join claimants who had been denied payment for twelve months, i.e., "[d]epositors found to have proven their claims shall be proven claimants." Id. In my view, this "once a claimant always a claimant until satisfied" interpretation of the statute is the only way the subsequent language of the claims process makes sense. Applying the majority's time-barred definition of claimant to this section renders the statute's separate discussion of depositors and claimants meaningless because, under that approach, a claimant is nothing more than a depositor who was unable to secure payment within the twelve months immediately preceding the licensee's failure.
[7] Finally, the majority interprets the fact that the legislature has since amended the statute to add a clear fifteen-month time bar as evidence that the previous definition of "claimant" intended to do the same. Op. at ¶ 26. I, however, believe this is evidence to the contrary. Had the legislature sought to change a twelve-month bar to a fifteen-month bar, I believe the legislature would have simply amended the definition of "claimant." Instead, as part of larger changes to the statute, the legislature removed several parts of the definition of "claimant," not just the language "within twelve (12) months following delivery[,]" see op. at 26, n.8, and inserted the following language in the section detailing the claims process:
(e) Only grain that has been delivered to a first purchaser licensee for sale or storage under a bailment not more than fifteen (15) months before the date of failure of the licensee may be considered by the director or the director's designated representative in determining the total proven storage and financial obligations due to depositors and the loss sustained by each depositor who has proven a claim.
Ind. Code § 26-3-7-16.5(e). Had the legislature intended to bar producers who delivered their grain more than twelve months before the date of failure with the previous version of the statute, this amended language evidences that it clearly knew how to do so.
[8] In sum, I believe that once a producer became a claimant they remained a claimant until satisfied, regardless of the date of failure. This, I believe, is more congruous with the statute's language and the statute's overall intent to aid farmers-not to exclude them.
[9] Applied here, the record reveals the grain delivered before October 8, 2014, some 83,146.78 bushels of corn and 17,293.41 *601 bushels of soybeans, was delivered under a deferred pricing arrangement. Under such an arrangement, "a producer delivers the grain, title transfers to the licensee, and the price for the grain is determined and paid at a later date." Op. at ¶ 6. Because the financial obligation remains uncertain until the producer requests payment from the licensee, however, the producer must also have requested payment in order for such obligation to have been "due." See Black's Law Dictionary 609 (10th ed. 2014) (defining "due" as "[i]mmediately enforceable" or "[o]wing or payable"); Black's Law Dictionary 499 (6th ed. 1990) ("The word "due" always imports a fixed and settled obligation or liability, but with reference to the time for its payment there is considerable ambiguity in the use of the term ...."). The record is silent, however, regarding when , or even if , Sears requested payment pursuant to the deferred pricing arrangement. If he had requested payment and was denied for a period of twelve months or if he had requested payment in the twelve months preceding Cline's failure, I believe he would also constitute a "claimant" for the purposes of the grain delivered before October 8, 2014. Therefore, I would reverse the judgment of the trial court and remand this cause for further evidence regarding the specifics of Sears' dealings with Cline under the deferred pricing agreement.

With the caveat in deferred pricing arrangements that a producer must also request payment in addition to delivering the grain within those twelve months. See infra ¶ 9.